**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

TODD PATTEE,

     Plaintiff,

vs.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

     Defendant.

No. 23-CV-2-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................... 3

II.    BACKGROUND ......................................................................... 3

    A.    Underlying Facts .................................................................. 3

    B.    Plaintiff's Appeal ................................................................. 7

    C.    Defendant's Denial of Plaintiff's Appeal ...................................... 9

III.    APPLICABLE LAW .................................................................. 10

IV.    ANALYSIS ............................................................................. 12

    A.    Procedural Issues ................................................................ 13

        1.    Defendant's Conflict of Interest ......................................... 13

        2.    Defendant's Late Decision Regarding Plaintiff's Appeal ........... 14

3.     Plaintiff's Right to Review and Respond ……………………16

B.     The Substantive Issue……………………………………………21

V.     CONCLUSION ……………………………………………………24

# I.    INTRODUCTION

Plaintiff Todd Pattee seeks judicial review of defendant Hartford Life and Accident Insurance Company's denial of long-term disability benefits to plaintiff under a Health and Welfare Plan. (Doc. 1). This Court has jurisdiction to review defendant's denial of plaintiff's claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), Title 29, United States Code, Section 1132, and under Title 28, United States Code, Section 1331.

For the following reasons, the Court finds defendant did not give plaintiff a reasonable opportunity for a full and fair review of the claim under Title 29, United States Code, Section 1133. *See also* 29 C.F.R. § 2560.503-1(h)(4). In light of the Court's first finding, the administrative record is incomplete, and thus the Court finds that it cannot decide the issue of whether defendant's termination of plaintiff's benefits was unreasonable.

# II.    BACKGROUND

## A.    Underlying Facts

Plaintiff was employed for about twelve years as a "Bag Plant Driver" by Twin City Concrete Materials, which means he was a truck driver. (Docs. 15-5, at 170; 14-7, at 34). He was a participant in a long-term disability ("LTD") plan insured by defendant. (Docs. 16, at 3; 17, at 3). In November 2014, plaintiff applied for LTD benefits, which defendant approved. (Doc. 17, at 4). The basis for plaintiff's eligibility was shortness of breath from a medical condition—non-ischemic cardiomyopathy—as well as dizziness from related medications, leading to defendant finding that plaintiff could no longer perform the essential duties of his job. (*Id.*). One of plaintiff's treating physicians, Dr. Susan Schima, M.D., also reports that plaintiff suffers from an "impaired ejection fraction," which also appears to be a heart issue. (Doc. 13-9, at 16). Plaintiff

3

has no symptoms from the impaired ejection fraction at rest but has symptoms with "normal activity." (*Id.*). Plaintiff lists other diagnoses in his brief—"chronic systolic heart failure with reduced LV ejection fraction, atrial fibrillation, right ventricular thrombus, dizziness and excessive fatigue"—each of which appear to be issues with or related to plaintiff's heart or related to the medications plaintiff takes. (Doc. 16, at 3).

To be eligible for LTD benefits under the policy for the first two years, the participant must be "prevented from performing one or more of the Essential Duties of Your Occupation." (Doc. 13-1, at 21). After the first two years, the participant is eligible for LTD benefits when they are "prevented from performing one or more of the Essential duties of . . . Any Occupation." (*Id.*). Under the policy, "Any Occupation" is defined as "any occupation for which You are qualified, or may reasonably become qualified, by education, training or experience, and that has an earnings potential greater than . . . the product of Your Indexed Pre-disability Earnings and the Benefit Percentage." (*Id.*, at 20). The parties set that amount at either $1,578.55 or $1,629.06 in 2019. (Docs. 16, at 4; 17, at 4).[1]

As noted above, defendant initially approved plaintiff's LTD claim in November 2014. (Doc. 17, at 4). Plaintiff continued with LTD benefits past 2016 for a few more years, meaning defendant determined that plaintiff met the requirements for LTD benefits, even under the more stringent second definition, during the period from late 2016 until defendant denied plaintiff's claim in 2019. (*Id.*, at 4–7). In 2017, plaintiff filed a separate claim for Social Security Disability Insurance, which was denied, and an Administrative Law Judge upheld the denial. (*Id.*, at 5). In November and December 2018, defendant retained a third party to perform investigative surveillance on plaintiff.

---

[1] It appears the lower number was the result of a miscalculation by defendant and the higher number is the proper calculation, at least according to defendant's notes. (*See* Doc. 13-1, at 91). Ultimately, the difference is not material enough to impact the outcome of the case.

(Doc. 16, at 4). The surveillance videos mostly show plaintiff sitting in a chair for periods of time, walking, and shopping. (Docs. 16, at 4; 17, at 6).

Then, in January 2019, defendant performed a recorded interview with plaintiff. (Doc. 14-7, at 33–51). Plaintiff reported that he can exercise as tolerated, which usually means walking half a block to a block at a normal to slow pace, which takes about two minutes. (*Id.*, at 36). He also stated that he can shop for "an hour at the most," stand in one spot for fifteen minutes before getting fatigued, sit for fifteen minutes at a time, drive for about an hour, and lift about 25 pounds maximum. (*Id.*, at 37, 40). Plaintiff also said that he can squat, kneel, and twist at the waist. (*Id.*, at 38). He cannot type and has no computer skills. (*Id.*, at 39–40).

On March 14, 2019, defendant obtained a "peer review" of plaintiff's situation by a third-party cardiologist, Dr. Rizwan Karatela, M.D. (*Id.*, at 3–10). Dr. Karatela reviewed many of plaintiff's medical records—mainly those of Dr. Schima—for the peer review. (*Id.*). Dr. Karatela also reviewed the surveillance video and talked on the phone with Dr. Schima, where the two "discussed the case in detail." (*Id.*, at 6–7). Dr. Schima said, among other things, that plaintiff has functional limitations, but that he can do desk work, though Dr. Schima did not say whether that could be on a full-time or part-time basis. (*Id.*, at 7). Dr. Karatela opined that "there are restrictions or limitations to [plaintiff's] activity, however, [Dr. Karatela feels plaintiff] would be capable of performing activity up to 40 hours per week with these restrictions." (*Id.*). Dr. Karatela continued, stating that plaintiff "is probably only capable of performing light level work capacity." (*Id.*). Dr. Karatela further noted that while the videos "may not accurately assess [plaintiff's] symptoms it did provide account of the physical activity [plaintiff] is capable of doing," and that the videos show plaintiff "is capable of more than sedentary level of exertion." (*Id.*, at 8). Ultimately, Dr. Karatela opined that, so long as plaintiff's

5

restrictions and limitations are supported, plaintiff "is capable of working full-time 8 hours day work 40 hours week." (*Id.*, at 9).

On March 27, 2019, defendant's vocational case manager, Laura Tracy, performed an "Employability Analysis Report" relying primarily on the information from Dr. Karatela's peer review report. (Doc. 14-6, at 37–63). Tracy used a computerized job matching system to figure out whether there are jobs that plaintiff could perform under his restrictions, considering other factors as well, including his work and educational history. (*Id.*). She listed plaintiff's work history as "truck driver, heavy," and inputted many of the restrictions that Dr. Karatela listed in his report. (*Id.*, at 37–40). Tracy listed seven occupations that met the criteria, each of which had a monthly median wage above $2,000. (*Id.*, at 39). According to Tracy, the occupations listed are either "lower semi-skilled" or "unskilled", meaning "no training or education is required to perform the essential duties." (*Id.*). The seven jobs were: (1) Chauffeur; (2) Mobile-Lounge Driver; (3) Escort-Vehicle Driver; (4) Order Caller; (5) Work-Ticket Distributor; (6) Assembler, Production; and (7) Compact Assembler. (*Id.*).

On April 16, 2019, defendant denied plaintiff's claim for LTD benefits from that date forward. (Doc. 13-8, at 7–13). Defendant's denial letter specifically cited a number of documents defendant relied on in denying plaintiff's continuing benefits, including Dr. Schima's records, the surveillance videos, the January 2019 interview with plaintiff, Dr. Karatela's peer review report, and Tracy's employability analysis report. (*Id.*, at 9). Defendant ultimately stated to plaintiff that the "weight of the medical evidence in your file does not support that you continue to meet the Policy definition of Disability[.]" (*Id.*, at 11–12). The policy defines disability as plaintiff being "prevented from performing one or more of the Essential Duties of . . . Any Occupation," and "Any Occupation" means one which plaintiff is "qualified, or may reasonably become qualified, by education, training or experience," and pays a certain minimum amount. (*Id.*, at 7–8).

6

In sum, defendant concluded that plaintiff was not prevented from performing the essential duties of certain occupations that plaintiff was qualified for and which pay a certain amount—in other words, defendant concluded that plaintiff is capable of going back to work.

### B. *Plaintiff's Appeal*

On October 21, 2019, plaintiff filed an appeal of defendant's initial denial of benefits. (Docs. 13-8, at 138–43; 13-9, at 1–7). In support of his appeal, plaintiff included answers to questions by Dr. Schima, a vocational report by a vocational consultant, additional medical records, and affidavits by plaintiff and his father. (Docs. 13-8, at 138–43; 13-9, at 1–2).

Dr. Schima noted that plaintiff may be able to work a job which does not require physical exertion, "but likely on a part time basis, as he has some fatigue from his medication." (Doc. 13-9, at 17). More specifically, Dr. Schima opined that plaintiff "is unable to work as a driver." (*Id.*, at 18). Dr. Schima also stated that plaintiff would generally be best suited to a job where he can sit for the majority of the time. (*Id.*, at 17).

The additional medical records appear to show, basically, that plaintiff's condition continued in 2019 as it had previously. (*See, e.g.*, Doc. 14-1, at 12). Plaintiff also reported having a "hard pounding beat" and feeling exhausted after moving things around in his garage one night. (*Id.*, at 21). Additionally, plaintiff saw a family medicine doctor for a wrist issue, and the doctor noted that plaintiff's heart "consistently skips the 6th beat" and that he has an "[e]xtra heart murmur in late diastole." (Doc. 14-2, at 2).

In plaintiff's affidavit, he reported his conditions consistent with information elsewhere in the record, including his January 2019 interview and Dr. Schima's notes and statements. (Doc. 13-9, at 8–10). He stated that he can only sit, stand, walk, or drive for short periods of time—he spends most of his time laying down or in a recliner.

(*Id.*).  Plaintiff basically reported that he cannot do anything for more than about 15-30 minutes without becoming exhausted or having swelling or fluid issues, including driving, mowing the lawn, and doing the dishes.  (*Id.*).  He has never had a desk job and has no computer skills.  (*Id.*, at 8).  Plaintiff also reported anxiety and concentration issues.  (*Id.*, at 8–9).  Finally, plaintiff responded to the surveillance videos, noting that his walking in the videos was for a short time and distance, and his carrying of his son was only for about 10 yards.  (*Id.*, at 10).  Plaintiff's father, Richard Pattee, stated similar issues.  (*Id.*, at 12–13).  Richard said that plaintiff is frequently tired, Richard helps plaintiff do things like grocery shop, and that plaintiff has difficulty doing relatively simple tasks like trimming very small branches from a tree.  (*Id.*).  Richard ultimately stated that plaintiff "can't go back to work" and that plaintiff would not be a dependable worker.  (*Id.*, at 13).  Richard added that plaintiff worries, which makes his health worse, and that plaintiff's brother died at 16 years old from the same disease plaintiff has.  (*Id.*).

Finally, plaintiff submitted an employability assessment report completed by vocational consultant Barbara Laughlin in support of his appeal.  (*Id.*, at 15, 27–31; Docs. 13-10; 13-11, at 1–13).  Laughlin used much of the information now contained in the administrative record in conducting her analysis, including documents and the like showing the underlying facts (*e.g.*, Dr. Schima's records and the video surveillance videos), defendant's reports (*e.g.*, Tracy's employability report and Dr. Karatela's peer review report), and plaintiff's additional material submitted in support of his appeal (*e.g.*, the affidavits by plaintiff and his father, plaintiff's additional medical records, and Dr. Schima's answers to questions).  Laughlin used what appears to be the same online database tool used by Tracy for her analysis, but found "[t]here are no occupations available to [plaintiff]."  (Doc. 13-9, at 31).  Laughlin went on to criticize Tracy's report on multiple grounds.  Laughlin stated that Tracy used the wrong work history for plaintiff, as Tracy used "truck driver, heavy, when he was a semi driver," and opined

that plaintiff's "pre-injury strength" should be "very heavy," and Tracy's analysis listed this category as "medium." (Doc. 13-10, at 1). Laughlin also took issue with Tracy's wage numbers, stating that "it would appear that Ms. Tracy is giving national employment numbers," where Laughlin believes using local or state wage levels is a better metric. (*Id.*). Laughlin's other issue with Tracy's wage levels is that in Laughlin's opinion, as a new employee, plaintiff would begin at a lower wage, meaning the median or mean wages are higher than what plaintiff would actually earn. (Doc. 13-10, at 8).

### C.   *Defendant's Denial of Plaintiff's Appeal*

Defendant received plaintiff's appeal and additional materials on October 22, 2019, the day after plaintiff's counsel sent it. (Doc. 13-2, at 6). The day defendant received plaintiff's appeal, defendant put the appeal in their "Appeals Queue," but defendant did not begin working on the appeal until plaintiff's counsel requested an update on December 23, 2019. (*Id.*). That day, December 23, 2019, defendant sent plaintiff's counsel a letter stating that defendant "started a review in response to [plaintiff's] appeal of the termination." (Doc. 13-8, at 3). Defendant's letter said that ERISA "allows the insurance company 45 days to make an appeal decision unless there are special circumstances that prevent completion of the review in that time period," in which case "the decision period can be extended by an additional 45 days." (*Id.*). Defendant stated in the letter that it had not made a decision about the appeal yet because defendant was "awaiting an independent review of the medical records" in plaintiff's file by a physician. (*Id.*). Defendant sent a request for a new medical review to Dr. Steven Borzak, M.D., on December 23, 2019—the same day defendant received plaintiff's counsel's letter. (*Id.*, at 126).

On January 2, 2020, Dr. Borzak submitted his report of plaintiff's situation to defendant. (*Id.*, at 126–33). Dr. Borzak opined that plaintiff "is impaired from

professional driving but the data supports ability of [plaintiff] to work full time in sedentary capacity." (*Id.*, at 131).

On January 6, 2020, defendant's vocational case manager, Tracy, completed an updated employability analysis report. (*Id.*, at 104–23). The main input update appears to be a downgrade of strength level, from sedentary and light levels in the previous analysis, to only sedentary in this analysis. (*Id.*, at 105). Tracy found a number of occupations which plaintiff could perform under his restrictions, met the wage criteria, and did not include being a driver. (*Id.*, at 106–07).

On January 7, 2020, defendant sent plaintiff a letter denying his appeal. (Docs. 13-7, at 30–34; 13-8, at 1–2). Defendant stated that it considered the new information submitted by plaintiff in coming to its decision, as well as Dr. Borzak's report and Tracy's employability report, and the social security administrative law judge's opinion denying plaintiff benefits in 2017. (Doc. 13-7, at 30–31). Defendant denied the appeal largely for the same reasons as the original denial—that is, although plaintiff has certain medical restrictions and limitations, defendant believes that plaintiff "can perform at least full-time sedentary work," which means he does not meet the Policy definition of disability, and therefore is not eligible for LTD benefits. (Doc. 13-8, at 1). Defendant did not offer plaintiff an opportunity to comment on or respond to Dr. Borzak's report or Tracy's updated employability report prior to denying plaintiff's appeal. (Doc. 13-7, at 34).

### III. APPLICABLE LAW

Plaintiff is empowered to bring this suit under Title 29, United States Code, Section 1132(a)(1)(B), which provides that a plan participant or beneficiary may bring suit "to recover benefits due to him under the terms of his plan." Generally, when, as

Case 1:23-cv-00002-CJW-KEM   Document 20   Filed 01/29/24   Page 10 of 24

here,[2] "a plan gives discretion to the plan administrator, then a plan administrator's decision is reviewed judicially for an abuse of discretion. Under an abuse of discretion standard of review, a plan administrator's decision will stand if reasonable; '*i.e.*, supported by substantial evidence.'" *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004) (quoting *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001)). "Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Fletcher-Merritt*, 250 F.3d at 1179) (alteration in original). Under this standard, this Court "must affirm the plan administrator's interpretation of the plan unless it is arbitrary and capricious." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010) (citing *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 896–97 (8th Cir. 2009)).

When, however, a plaintiff presents "material, probative evidence demonstrating that (1) a palpable conflict of interest . . . existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [the plaintiff]," the plan administrator's decision is entitled to a less deferential standard of review. *Ortlieb*, 387 F.3d at 782 (citation omitted). To establish a serious breach of the plan administrator's fiduciary duty, the plaintiff is required to show that the conflict of interest "has some connection to the substantive decision reached." *Id.* (internal quotation marks omitted). The existence of a conflict of interest, without more, however, will not result in a court applying a less deferential standard of review. *See Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 320 (8th Cir. 2018) (holding that the Supreme Court of the United States abrogated prior case

---

[2] The Policy here gives defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." (Doc. 13-1, at 20).

law to the extent it "allowed a less deferential standard of review based on *merely* a conflict of interest") (emphasis in original).

When the entity that administers the plan "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," the dual role the administrator plays creates a conflict of interest that a court should consider "as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The significance given to the conflict of interest will depend upon the circumstances of the particular case. *Id.* The Eighth Circuit Court of Appeals has outlined a number of factors for courts to consider when determining how much weight to afford a conflict of interest, such as a biased claims review process, the employment of reviewing medical professionals whose compensation was tied to their findings or who were employed by the insurer, or a review process that merely "rubberstamp[ed] favorable medical opinions." *Boyd*, 879 F.3d at 320–21. When "the record contains no evidence about [the plan administrator]'s claims administration history or its efforts to ensure that claims assessment is not affected by the conflict," the conflict is given only "some weight." *Id.* at 321 (alterations in original) (citations and internal quotation marks omitted). If none of the relevant factors weigh against the plan administrator, the conflict of interest is still a factor in the analysis of the claim. *Id.*

## IV.   ANALYSIS

The Court will discuss defendant's conflict of interest, other alleged procedural issues, and what effect the issues have on the outcome of the case. Because of the Court's holding regarding the right to review and respond issue, the Court will only touch on the substantive issue of whether defendant's denial was arbitrary and capricious.

12

### A.    Procedural Issues

Plaintiff raises what appears to be three distinct—though related—issues here, with all three centering on the fairness of defendant's process in administering plaintiff's claim.  First, plaintiff argues that defendant's "conflict of interest limits the deferential standard of review." (Doc. 16, at 12–13).  Plaintiff then argues that defendant's decision denying plaintiff's appeal was late. (*Id.*, at 13–14).  Plaintiff further argues that defendant "deprived [plaintiff] of the right to review and comment on reviewers' reports," and that this violation of plaintiff's right prejudiced plaintiff. (*Id.*, at 14–16).

### 1.    Defendant's Conflict of Interest

The first issue is what impact defendant's dual status as both policy administrator and insurer has.  Plaintiff does not dispute that defendant "is entitled to a deferential standard of review based on policy language." (*Id.*, at 12).  Plaintiff argues, however, that this deference "is tempered" because of defendant's dual role as policy administrator and as the insurer.  (*Id.*).  Plaintiff asserts that this conflict of interest should be given some weight in the analysis. (*Id.*, at 13).  Defendant does not seriously dispute plaintiff's argument here.

Plaintiff is correct that defendant's conflict of interest must be given some weight by the Court.  However, absent other pertinent facts, that is the end of the analysis on the issue.  This is because the existence of a conflict of interest, without more, will not result in a court applying a less deferential standard of review.  *See Boyd*, 879 F.3d at 320.  Plaintiff does not accuse defendant of having a biased claims procedure or claim that the medical experts' compensation was tied to a certain result, two of the factors which could give the conflict of interest more weight in the analysis.  *Id.*  Thus, the Court agrees that defendant's conflict of interest must be considered in the analysis, but the Court disagrees with plaintiff's contention that the deferential standard of review "is tempered" as a result of defendant's status here.

## 2. *Defendant's Late Decision Regarding Plaintiff's Appeal*

The second procedural issue relates to the timing of defendant's decision denying plaintiff's appeal. Federal regulation provides that defendant must notify plaintiff of defendant's determination of the appeal within a reasonable time, not to exceed 45 days, after receipt of plaintiff's appeal documents. 29 C.F.R. § 2560.503-1(i)(3)(i). Defendant is allowed to extend that period to process the claim if it notifies plaintiff of the extension prior to the expiration of the 45 days. 29 C.F.R. § 2560.503-1(i)(1)(i).

Here, plaintiff appealed on October 21, 2019, which defendant received the following day. (Docs. 13-8, at 138–43; 13-9, at 1–7; 13-2, at 6). Defendant first responded only after plaintiff's counsel sent defendant a letter on December 23, 2019— which is more than 45 days after defendant received plaintiff's appeal. (Doc. 13-8, at 3). Defendant's letter essentially claimed that defendant had decided to extend the 45-day period. On January 7, 2020, defendant sent a letter to plaintiff denying his appeal. (Docs. 13-7, at 30–34; 13-8, at 1–2). The delay appears to have been due to an internal mix up by defendant in the form of failing to assign plaintiff's appeal to anybody in particular until plaintiff asked defendant for an update.

There is no serious factual issue here. Defendant did not send plaintiff notification of the appeal decision within the time frame required by regulation. The only issue is how that fact informs the analysis here. Plaintiff concedes that "decisional delays do not change the standard of review," but argues that it "must be considered when determining whether the plan administrator abused its discretion." (Doc. 16, at 13). Plaintiff argues that the timeline of events shows that defendant "was in a hurry to complete its review of [plaintiff's] appeal as quickly as possible . . . " (*Id.*). It appears plaintiff's argument here is that the hurried decision—defendant first assigned the appeal to a representative on December 23, 2019, and it was ultimately resolved on January 7, 2020—means the Court should not view defendant's decision with as much deference as would normally

14

be the case. Defendant argues that the delay is only relevant in the analysis if it shows arbitrary decision-making. (Doc. 17, at 19). Essentially, defendant's argument is that there is no evidence of the delay having an impact on its decision, and that plaintiff has not pointed to anything proving otherwise. (*Id.*).

Both parties are correct. Plaintiff is correct when he argues that the delay "must be considered when determining whether [defendant] abused its discretion." (Doc. 16, at 13). Defendant is also correct, however, when it argues that the late review "does not inherently show unfairness or bias" and that there is no evidence of the delay showing arbitrary decision-making. (Doc. 17, at 19).

These kinds of procedural issues weigh heavily when they show that "the result reached was the product of an arbitrary decision or the plan administrator's whim." *McIntyre v. Reliance Standard Life Ins. Co.*, 73 F.4th 993, 1002 (8th Cir. 2023) (internal quotations omitted). "By contrast, '[m]inor procedural defects . . . do not carry significant weight.'" *Id.* (quoting *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 830 (8th Cir. 2014) (alterations in original). The *McIntyre* court considered the defendant's motivation for the delay in determining whether to give the delay weight in the analysis or not. The court noted that the delay was not "an attempt to find a sympathetic doctor, pressure McIntyre to drop her appeal, or otherwise rig the appeals process against her." *Id.* Ultimately, the *McIntyre* court held that the delay did not "indicate arbitrary decision-making," and thus carried little weight in the abuse of discretion analysis. *Id.* at 1003.

Similarly, here, there is no evidence of defendant's delay indicating arbitrary decision-making. Defendant had no motivation for the delay; it simply slipped through the proverbial administrative cracks. The Court is not aware of any evidence showing that the delay was for nefarious reasons like an attempt to find a sympathetic doctor or an attempt to rig the process—some of the examples given in *McIntyre*. *Id.* at 1002.

Thus, like in *McIntyre*, defendant's delay under the circumstances must carry little weight in the Court's abuse of discretion analysis.

### 3. Plaintiff's Right to Review and Respond

Plaintiff appealed defendant's denial of benefits on October 21, 2019, and defendant received plaintiff's appeal the next day. Plaintiff then sent a follow-up message to defendant on December 23, 2019, requesting an update on the status of the appeal. That same day, defendant sent a request to Dr. Borzak for a medical review of plaintiff's file. Dr. Borzak completed his report on January 2, 2020. Defendant's vocational analyst, Tracy, completed her revised employment report using Dr. Borzak's report on January 6, 2020. On January 7, 2020, defendant sent plaintiff a letter denying plaintiff's appeal, based in part on Dr. Borzak's report and Tracy's updated report. Notably, defendant never sent plaintiff either of these reports prior to making its decision to deny plaintiff's claim for benefits. Also, as defendant recognized in its letter denying plaintiff's appeal, plaintiff had "reserved the right to supplement the appeal and to review and dispute any new evidence prior to [defendant's] determination." (Doc. 13-7, at 31).

ERISA provides that employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The Department of Labor provides administrative regulations defining the scope of a full and fair review. *See* 29 C.F.R. § 2560.503-1. The specific rule largely at issue here, 29 C.F.R. § 2560.503-1(h)(4), was amended in 2018. As the parties recognize in their briefing, whether defendant afforded plaintiff a full and fair review turns on which version of the regulations are operative in this case.

Prior to the amendment, paragraph (h)(4)—entitled "Plans providing disability benefits"—simply incorporated the full and fair review requirements from other types of plans, citing to paragraphs (h)(2)(ii) through (iv) and (h)(3)(i) through (v). Paragraph

(h)(2)(iii), in turn, required the plan administrator to "provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." The Eighth Circuit Court of Appeals interpreted the pre-amendment rules as giving the claimant the right to review relevant evidence after the initial denial and after the decision on appeal, but, specifically, no right of "reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal." *Midgett*, 561 F.3d at 896. Put another way, it was not necessary to give the claimant the opportunity to review and rebut new evidence or reports which were not used in the initial denial of benefits but were used for the first time by the plan administrator on appeal. Thus, if the pre-amendment version of the rules apply here, then plaintiff had no right to review or respond to Dr. Borzak's report or Tracy's second report until after defendant's decision on appeal.

The current version of the rules, as amended in 2018, add much more substance to paragraph (h)(4). The plan administrator has extra requirements on top of the previous requirements. Paragraph (h)(4) now provides, in its entirety:

> (4) Plans providing disability benefits. The claims procedures of a plan providing disability benefits will not, with respect to claims for such benefits, be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraphs (h)(2)(ii) through (iv) and (h)(3)(i) through (v) of this section, the claims procedures—
>
> > (i) Provide that before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; such evidence must be provided as soon as possible and

17

sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date; and

(ii) Provide that, before the plan can issue an adverse benefit determination on review on a disability benefit claim based on a new or additional rationale, the plan administrator shall provide the claimant, free of charge, with the rationale; the rationale must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date.

29 C.F.R. § 2560.503-1(h)(4).

Under the new rule, the administrator is required to provide the claimant with additional evidence considered or relied upon in making the decision on appeal. The administrator is required to do the same with any new rationales it will be using in coming to the decision on appeal. Under both the new evidence and new rationale sections, the administrator is required to both provide the claimant with the information "sufficiently in advance" of the date the administrator must make the decision on appeal, as well as allow the claimant "a reasonable opportunity to respond" to the new evidence or rationale. *Id*. Defendant does not argue that it complied with the amended version of the rule if it applies here. Nor could defendant make such an argument—the parties appear to agree that plaintiff was not allowed access to the new reports until after defendant denied plaintiff's appeal—and, of course, if plaintiff was not aware of the new reports, he could not have responded to the new reports.

The only issue, then, is which version of the rule applies. Plaintiff argues that the amended version of the rule applies, and defendant argues that the prior version of the rule applies. (Docs. 16, at 14–16; 17, at 19–22). A straight-forward reading of the regulation's text leads the Court to agree with plaintiff on this front.

The 2018 amendments included provisions for effective dates for the changed rules. *See* 29 C.F.R. § 2560.503-1(p)(1)–(4). Paragraph (p)(1) provides that, generally, the amended rules apply to claims filed on or after January 1, 2002. Because plaintiff filed his claim for benefits here in 2014, the amended rules will apply unless there is an applicable exception in the other (p) subparagraphs. Paragraph (p)(2) applies to claims under group health plans, not for disability benefits, so it is inapplicable here. Paragraph (p)(3) modifies the application date of several other provisions. None of the listed provisions in (p)(3) are in (h)(4), so the third subsection in paragraph (p) does not modify the general rule either.

Paragraph (p)(4) modifies the operative provision, (h)(4), for "claims for disability benefits filed under a plan from January 18, 2017 through April 1, 2018[.]" For claims filed during that time period, paragraph (h)(4) essentially reverts to the old version of the regulation. That is, for claims filed between January 18, 2017 and April 1, 2018, the old version of rule (h)(4) applies. Thus, for all claims filed since 2002, the amended version of (h)(4) applies, except for claims filed between January 18, 2017 through April 1, 2018. 29 C.F.R. § 2560.503-1(p)(1)–(4).

The Seventh Circuit Court of Appeals interpreted the same issue recently. *See Zall v. Standard Ins. Co.*, 58 F.4th 284, 291–97 (7th Cir. 2023). The *Zall* court's analysis is highly detailed and persuasively shows why the plain language of the regulation leads to the conclusion this Court came to above. The defendant in *Zall* made many of the same arguments defendant does here regarding the Department of Labor's purported intent and the rule-making process. *Id.* at 293–94. Those arguments fail for the reasons stated in *Zall*; the most important reason being the rule that "where the text of the regulation itself is clear, [the Court] need not consider extratextual evidence[.]" *Id.* at 293. *See also Caudill v. Hartford Life & Accident Ins. Co.*, Case No. 1:19-cv-963, 2023 WL 2306666, at *4–5 (S.D. Ohio March 1, 2023) ("It may well be that the

19

DOL intended that (h)(4)(i) would apply only to claims filed after April 1, 2018. However, that is not what the regulation actually says.") Here, the text is clear, so the Court need not look to other sources.

Defendant cites several cases as support for its argument that the old version of the regulation applies here. *See Elias v. UNUM Life Ins. Co. of Am.*, Case No. 21-cv-1813 (WMW/TNL), 2023 WL 375649, at *9 (D. Minn. Jan. 24, 2023); *Crites v. Aetna Life Ins. Co.*, Case No. 4:19-cv-00098-KGB, 2020 WL 2616578, at *10 (E.D. Ark. May 21, 2020); *Mayer v. Ringler Assocs. Inc.*, 9 F.4th 78, 86 n.4 (2d Cir. 2021). *Elias* provides no analysis of the issue, instead relying solely on two cases: the *Mayer* case, and the district court's opinion in *Zall*, which was reversed by the Seventh Circuit Court of Appeals in the opinion discussed above. *Elias*, 2023 WL 375649, at *9. *Mayer*, in turn, was a case where the appeals and denials all occurred in 2017. *See Mayer*, 9 F.4th at 83. Thus, the 2018 amendments could not have been operative in *Mayer*, so the court's use of the pre-2018 regulations in that case do not provide support for defendant's position here. The denial and appeal in *Crites* occurred in 2017 and 2018. *See* 2020 WL 2616578, at *4–6. The *Crites* court stated that the 2018 amendment to paragraph (h)(4)(i) "applies to claims for disability benefits filed under a plan after April 1, 2018," citing paragraph (p)(3) for that proposition. *Id.*, at *10 n.3. As discussed above, paragraph (p)(3) does not mention paragraph (h)(4), so it is unclear how the *Crites* court came to that conclusion.

Ultimately, the plain language of the regulation requires the Court to apply the amended version of the rule to this case. Further, the cases defendant cites in support of its argument have analytical flaws or rely on other cases with analytical flaws. Finally, the cases which analyze the issue with a fine-tooth comb, including the most well-reasoned case from a federal appellate court, each hold that the new version of the regulation apply in this situation. *See, e.g.*, *Zall*, 58 F.4th at 291–97. Thus, because the

amended version of the regulation applies here, defendant did not allow plaintiff the opportunity to have a full and fair review as was required.

Finally, defendant's actions may have prejudiced plaintiff. As plaintiff points out, defendant did not rely on plaintiff's earlier social security disability proceedings in the initial denial of benefits, but defendant did rely on the social security proceedings for the first time in denying plaintiff's appeal. (*See* Doc. 13-8, at 1, 9–12). Thus, plaintiff did not have the opportunity to respond to the use of this new evidence and/or rationale even though he had the right to do so. Plaintiff also did not have the opportunity to respond to both Dr. Borzak's report as well as Tracy's second report, both of which defendant relied upon in deciding the appeal. (Doc. 13-7, at 30–34). Plaintiff has serious criticisms of both of these reports, especially Tracy's report, which plausibly could have caused defendant to at least triple check the analysis before making its decision on appeal. Plaintiff was denied the opportunity to respond, however, and therefore the case must return to the administrative appeals process to give plaintiff the opportunity to review and respond to any new evidence defendant produced, produces, or relies on in determining the outcome of the appeal, in compliance with the Code of Federal Regulations Title 29, Section 2560.503-1, specifically Section 503-1(h)(4).

**B.** *The Substantive Issue*

As both parties recognize, the ultimate issue is whether defendant's termination of plaintiff's benefits, as well as the decision to uphold the termination on administrative appeal, was "arbitrary and capricious, meaning it was unreasonable or unsupported by substantial evidence." *McIntyre*, 73 F.4th at 1000. As discussed above, the Court will give "some weight" to defendant's dual role as plan administrator and insurer. *See Boyd*, 879 F.3d at 320. Defendant's decisions will be "reviewed judicially for an abuse of discretion. Under an abuse of discretion standard of review, a plan administrator's

decision will stand if reasonable; '*i.e.*, supported by substantial evidence.'" *Ortlieb*, 387 F.3d at 781 (quoting *Fletcher-Merrit*, 250 F.3d at 1179).

The issue here is that the administrative record—the only thing the Court can review—is not in its final form. Because plaintiff was denied his right to review and respond to certain evidence used by defendant, the Court cannot make a finding regarding whether defendant's decision was arbitrary and capricious. Or, rather, any finding by the Court will be a finding on an incomplete record, which means it will not settle the ultimate issue.

With that being said, the Court notes that, on this record, defendant's decisions do not appear to rise to the level of arbitrary and capricious. There is certainly conflicting evidence and conflicting characterizations of the evidence in the record. There is likely enough evidence to go either way here, which means, under an abuse of discretion standard of review, the Court would not disturb defendant's decision either way.

Some of plaintiff's best evidence here is Dr. Schima's answers to questions submitted by plaintiff in the appeal process where Dr. Schima opined that plaintiff cannot work as a driver and likely is only suited to part-time work. (Doc. 13-9, at 17–18). Plaintiff and his father's affidavits also provide some support for plaintiff's case. The picture the affidavits paint shows plaintiff essentially only being able to lay around or sit most of the day, plaintiff having difficulty doing certain everyday tasks, and plaintiff often becoming tired or weak upon a fairly minimal level of physical exertion. Laughlin's employability report also supports plaintiff's case. Laughlin, using either the same or a similar system as defendant used, but seemingly using slightly different inputs, concluded that there were no jobs plaintiff was fit for that satisfied the standard in the policy. Laughlin also launched criticisms at Tracy's first report which, if true, call Tracy's report into question. Of course, further supporting plaintiff is the fact that he had the right to

respond to some of defendant's additional evidence, but defendant did not in fact allow him that right.

Defendant has evidence supporting its decision to terminate plaintiff's benefits as well, though. Two doctors, Dr. Karatela and Dr. Borzak, each opined that plaintiff could go back to work full time under certain restrictions. Defendant's vocational manager, Tracy, used the restrictions and other information about plaintiff and found a number of occupations plaintiff could perform which paid enough that plaintiff would not meet the policy definition of disabled anymore. The surveillance video also shows plaintiff doing some light physical activity like shopping, carrying fairly light loads, and walking short distances. As defendant recognizes, the video does not provide overwhelming evidence either way, but it is not unreasonable for defendant to rely on it as a small piece of evidence. Defendant also relied, at the appeal stage, on the social security administrative law judge's opinion denying plaintiff's claim for social security disability insurance. This was one of the bases plaintiff was not given the opportunity to respond to, so it is hard to say how much weight to give this aspect of the evidence, but it certainly does not hurt defendant's argument that its decision was reasonable.

In the end, under this incomplete record, it is likely that defendant's decision to terminate plaintiff's benefits was not unreasonable. The doctors appear to disagree as to whether plaintiff can go back to work, and, more specifically, what level of work plaintiff can perform—whether full or part-time. As both parties recognize, defendant cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Willcox v. Liberty Life Assurance Co. of Bos.*, 552 F.3d 693, 701 (8th Cir. 2009) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Defendant, however, "need not accord special deference to a treating physician's opinion." *Id.* This case appears to be a disagreement between physicians, not a case where defendant arbitrarily refused to credit reliable evidence.

In the end, the Court cannot determine one way or the other whether defendant's decisions were arbitrary and capricious at this time. The record is incomplete because plaintiff was not given the opportunity to review and respond to the new evidence defendant relied on in coming to its decision on appeal. Because the record is incomplete, the Court cannot rule on this issue.

## V.    CONCLUSION

For these reasons, the Court finds defendant did not give plaintiff a reasonable opportunity for a full and fair review of the claim under Title 29, United States Code Section 1133. *See also* 29 C.F.R. § 2560.503-1(h)(4). Because of the Court's first finding, the administrative record is incomplete, and thus the Court finds that it cannot decide the issue of whether defendant's termination of plaintiff's benefits was unreasonable. Thus, the Court **remands** the case to the plan administrator for further proceedings consistent with this order. The Court will maintain jurisdiction of this case pending further action by the plan administrator.

Plaintiff requested an award of attorney's fees. (Doc. 16, at 19). At this point, however, the question of attorney's fees is premature because the Court has not yet determined the merits of the dispute. Thus, the Court will **hold in abeyance** plaintiff's request for attorney's fees.

**IT IS SO ORDERED** this 29th day of January, 2024.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

24